**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

SHAREE MILLER,

      Plaintiff,

vs.

ANTHONY STEWART, in his official
capacity as Warden of Women's Huron Valley
Correctional Facility, ROBIN HOWARD, in
her individual capacity, and RENATA
PATTON, in her individual capacity,

      Defendants.

——————————————————/

Case No.

Hon.

Daniel S. Korobkin (P72842)
Michael J. Steinberg (P43085)
American Civil Liberties Union Fund
  of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6824
dkorobkin@aclumich.org
msteinberg@aclumich.org

Attorneys for Plaintiff

——————————————————/

## COMPLAINT

      Plaintiff Sharee Miller, by and through her attorneys from the American Civil Liberties

Union Fund of Michigan, states for her complaint against Women's Huron Valley Correctional

Facility Warden Anthony Stewart, Inspector Robin Howard, and CPC Renata Patton:

### INTRODUCTORY STATEMENT

      1.      Sharee Miller, a prisoner observation aide ("POA") at Women's Huron Valley

Correctional Facility ("Huron Valley"), witnessed extremely disturbing incidents of staff

misconduct involving the abuse and mistreatment of mentally ill female prisoners by the staff of that facility.

2.     When Ms. Miller attempted to get help for these women and bring these incidents to the attention of advocates and authorities outside the facility, she was terminated from her position of employment in retaliation for her efforts.

3.     Retaliation of the kind described above is unconstitutional and unlawful.  It also presents a serious danger to the health and safety of inmates who may be abused or mistreated in the future, as Ms. Miller and other POAs will be deterred from reporting such incidents for fear of similar retaliation.

4.     Ms. Miller therefore brings this lawsuit to vindicate her rights and to ensure that corrections officials do not continue to punish her and other inmates for speaking out about abuse and mistreatment of mentally ill inmates at Huron Valley.

## JURISDICTION AND VENUE

5.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the Constitution and laws of the United States.

6.     This Court has supplemental jurisdiction over plaintiff's state-law claim pursuant to 28 U.S.C. § 1367.

7.     Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to plaintiff's claims occurred at Huron Valley, a prison located in Washtenaw County.

## PARTIES

8.     Plaintiff Sharee Miller is a prisoner at Huron Valley.  Her prisoner ID number is 326122.

9.     Defendant Anthony Stewart is Warden of Huron Valley.  He is being sued in his official capacity.

10.     Defendant Robin Howard is a corrections officer with the rank or job title of Inspector at Huron Valley.  She is being sued in her individual capacity.

11.     Defendant Renata Patton is a staff member with the title "CPC" at Huron Valley. She is being sued in her individual capacity.

## FACTUAL ALLEGATIONS

**The Prisoner Observation Aide Program**

12.     It is the policy of the Michigan Department of Corrections to place suicidal or self-injurious prisoners alone in a cell under one-on-one direct and continuous observation.

13.     Instead of relying solely on corrections staff to observe such prisoners, the Michigan Department of Corrections uses specially selected and trained prisoners to perform this function.

14.     Such prisoners are known as prisoner observation aides, or POAs.

15.     POAs have been used by the Michigan Department of Corrections since approximately 2012.

16.     Many of the prisoners being observed by POAs suffer from serious mental illness and/or disability.

17.     The POA's job is to continuously observe the prisoner, write what he/she observes at regular intervals on an observer log, and contact a corrections officer or other staff if the prisoner is in distress or some other emergency arises.

18.     The POA program's "rules and procedures" include maintaining confidentiality. They state:

Away from the Job

[] Confidentiality is very important in prisoner observation.  Relevant
information should only be shared with staff or the next shift of Prisoner
Observers.  Inappropriate sharing of information about the observed
prisoner will be grounds for immediate removal from the job.  Prisoner
Observers are only to discuss what the assigned prisoner says/does or what
is said/done to the prisoner with housing staff on the unit or relief
observers (staff or prisoner).

**Sharee Miller Witnesses and Reports Abuse**

19.     Sharee Miller began working as a POA at Huron Valley in or about March 2014.

20.     Ms. Miller received job training as a POA before she assumed her responsibilities
in that position.

21.     Ms. Miller was paid wages for her work as a POA.

Incident Involving Rochelle Bielby

22.     During one of her POA shifts in or about April 2014, Ms. Miller witnessed
corrections staff abuse and mistreat an inmate named Rochelle Bielby who suffers from serious
mental illness and disability.

23.     After Ms. Bielby had become upset and lost her temper inside her cell, corrections
officers stripped her clothes off and restrained her.  They cuffed her wrists, cuffed her ankles,
and, using a chain, hog-tied her wrists and ankles together behind her back with her knees bent
while leaving her lying on her stomach completely naked and alone in her cell.

24.     Ms. Bielby repeatedly cried out that she was in pain, but officers did not respond
to help her.

25.     Ms. Miller asked officers how long Ms. Bielby would have to stay in this painful
and degrading position, and she was told that Ms. Bielby would remain there for at least two
hours, and longer if she didn't learn to behave.  An officer later told Ms. Miller that Ms. Bielby

4

would remained hog-tied and naked for an additional hour because she had struggled and tried to get out of the restraint.

26.     During this time, Ms. Miller observed that Ms. Bielby was sliding off her bed and could be seriously injured if she hit the cement floor face first without the ability to break her fall.  Ms. Miller notified an officer about this, but the officer told her that there was nothing she could do, and walked away.

27.     During the three or more hours that Ms. Bielby was hog-tied, naked, and screaming out in pain, at no time did medical personnel check to see whether she was injured or whether her health or safety was at risk.

28.     During the three or more hours that Ms. Bielby was hog-tied, naked, and screaming out in pain, at no time was she permitted to use the bathroom.

29.     During the three or more hours that Ms. Bielby was hog-tied, naked, and screaming out in pain, at no time were her restraints loosened to lessen her discomfort.

30.     Ms. Miller, disturbed by this abuse and mistreatment of a mentally ill inmate, made several attempts to address the problem with authorities within the facility, to no avail.

      a.     Ms. Miller first complained to a sergeant at the end of her shift about what she had witnessed, but the sergeant told her dismissively that Ms. Bielby would be fine.

      b.     At a POA program meeting the next day, Ms. Miller complained to CPC Patton, who supervised the POA program, but CPC Patton told her that what the officers had done was appropriate and her only job as a POA was to chart her observations in a log.

      c.     Ms. Miller then sent a kite (written request) to Inspector Howard, but she

received no response.

31.     After unsuccessfully attempting to get help within Huron Valley for the abuse and

mistreatment she had witnessed, Ms. Miller contacted professional advocates outside the facility

to ask for help.

32.     Acting on Ms. Miller's behalf, persons and organizations outside the facility then

reported what she had witnessed to public officials and agencies, including:

      a.     a correctional mental health rights specialist employed by the State of

          Michigan;

      b.     the legislative corrections ombudsman whose duty is to investigate

          complaints involving Michigan prisons; and

      c.     the Civil Rights Division of the United States Department of Justice,

          which has federal statutory authority to investigate complaints involving

          prison conditions.

33.     Based on Ms. Miller's complaints, some or all of the above-listed individuals and

organizations initiated investigations regarding Ms. Bielby's treatment.

34.     In early June 2014, Inspector Howard met with Ms. Miller and denied that Ms.

Bielby had been mistreated in any way.

Incident Involving Darlene Martin

35.     In mid-June 2014, Ms. Miller again witnessed disturbing abuse and mistreatment

of a mentally ill and/or disabled inmate over the course of several POA shifts, this time when she

was a POA for an inmate named Darlene Martin.

36.     Ms. Miller observed that Ms. Martin was confused and disoriented.  Due to this

condition, Ms. Martin was not eating, and she was unable to operate the sink in her cell to drink

water.  In an effort to drink water, Ms. Martin tried to splash water out of the toilet in her cell, but this made a mess and corrections officers turned off all water to her cell.

37.     Ms. Martin became very thirsty and begged repeatedly for water, but corrections officers refused these requests and generally ignored Ms. Martin's condition.  Every few hours they brought a tiny paper cup with a very small amount of water in it to Ms. Martin's cell, but Ms. Martin remained dehydrated and her requests for additional water were denied.

38.     Ms. Miller asked officers to help Ms. Martin by bringing her water, but officers dismissed these requests and told Ms. Miller that Ms. Martin would be all right.

39.     Ms. Miller notified the sergeant on duty that Ms. Martin was not eating, was being denied water, and appeared to be in mental or medical distress, but the sergeant on duty dismissed these requests and took no action to help Ms. Martin.

40.     Over the course of several days as a POA for Ms. Martin, Ms. Miller sent multiple kites to CPC Patton and Inspector Howard about the fact that Ms. Martin was not eating, was being denied water, and appeared to be in mental or medical distress, but her kites went unanswered.

41.     Ms. Miller observed that Ms. Martin's condition was dramatically worsening. Ms. Martin was foaming at the mouth, vomiting, naked, and mostly unresponsive to verbal cues.

42.     A nurse occasionally visited Ms. Martin's cell to administer a shot.  Ms. Miller was alarmed that the nurse, seemingly unconcerned about Ms. Martin's condition, continued to administer shots while Ms. Martin was undernourished, dehydrated, only semi-conscious, vomiting, and foaming at the mouth.

43.     The nurse who visited Ms. Martin's cell to administer shots did not take Ms. Martin's vital signs, did not attempt to engage Ms. Martin in any conversation, and did not

appear to be concerned about Ms. Martin's deteriorating condition.

44.     It should have been obvious that Ms. Martin was in need of medical attention because eventually Ms. Martin was slumped over in a semi-conscious state, naked and exposed, foaming at the mouth, and not responding to verbal communication.

45.     Ms. Miller reported Ms. Martin's condition to the nurse on duty and expressed serious concern for Ms. Martin's physical health, but the nurse dismissed Ms. Miller's concerns and said that she knew what was doing.

46.     In sum, the nurse took no action to help Ms. Martin or respond to her worsening condition.

47.     Approximately one hour later, Ms. Martin went into cardiac arrest.

48.     Emergency medical personnel arrived and attempted to resuscitate Ms. Martin. They took her by ambulance to a nearby hospital, where she was placed on life support.

49.     Initially Ms. Martin was not expected to survive.  She eventually awoke and was returned to the facility, although she suffered permanent brain damage as a result of the incident.

50.     Ms. Miller continued to attempt to report what she had witnessed within the facility, but corrections officers and CPC Patton told her that her job was simply to chart what she observed in a log and did not indicate that they would take any action to investigate.

51.     After witnessing the incidents involving Ms. Bielby and Ms. Martin, Ms. Miller feared that other mentally ill women were at risk of similar abuse and mistreatment.  She therefore again contacted professional advocates outside Huron Valley to ask for help.

52.     Acting on Ms. Miller's behalf, persons and organizations outside the facility again reported what she had witnessed to public officials and agencies, leading to continued outside investigation of mental health treatment at Huron Valley.

**Defendants Terminate Miller for Reporting the Abuse**

53. On July 16, 2014, CPC Patton informed Ms. Miller that she was terminating Ms. Miller from her position as a POA.

54. CPC Patton stated that she was terminating Ms. Miller at the directive of Inspector Howard.

55. Ms. Miller later received written documentation regarding her termination signed by CPC Patton, which states:

> Prisoner Miller 326122 began working as a prisoner observation aid on 3/5/2014.  On 7/11/2014, classification was notified by Inspector Howard that prisoner Miller has engaged in sharing confidential information regarding prisoners she had observed with persons other than staff or a relieving POA.  According to Prisoner Observation Rules and Procedures signed by prisoner Miller on 4/8/2014 Section "Away from the Job" Paragraph 1 it states that "Confidentiality is very important in prisoner observation.  Relevant information should only be shared with staff or the next shift of prisoner Observers.  Inappropriate sharing of information about the observed prisoner will be grounds for immediate removal from the job.  Prisoner Observers are only to discuss what the assigned prisoner says/does or what is said/done to the prisoner with housing staff on the unit or relief observers (staff or prisoner)".  Based on information received from Inspector Howard's office, it has been determined that prisoner Miller did not comply with the above confidentiality statement, thus she is being removed from the POA position effective immediately.

56. Although Ms. Miller disclosed information necessary to report the staff misconduct constituting abuse and mistreatment of mentally ill inmates that she witnessed during her work as a POA, Ms. Miller never shared confidential information inappropriately.  Rather, Ms. Miller was terminated from her position for reporting the abuse and mistreatment she witnessed to persons outside Huron Valley, after she was unable to get help through internal channels.

57. As a proximate result of defendants having terminated Ms. Miller from her position as a POA:

    a.     Ms. Miller has suffered lost wages;

    b.     Ms. Miller has suffered mental, emotional and psychological injury and distress;

    c.     Ms. Miller has suffered injury to her reputation;

    d.     Ms. Miller is unable to obtain other desirable prisoner jobs or assignments because her record now includes a negative work report in connection with her having reported the abuse she witnessed;

    e.     Ms. Miller is less likely to report other abuse or staff misconduct that she witnesses for fear of additional retaliation; and

    f.     other POAs are afraid to report abuse or staff misconduct that they witness for fear that they, too, will suffer retaliation for doing so.

**Exhaustion of Administrative Remedies**

58.    Plaintiff exhausted all available administrative remedies on August 27, 2015.

### CLAIMS FOR RELIEF

59.    Based on the allegations set forth above, plaintiff is entitled to relief on the two counts identified below.

### COUNT ONE
### VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS
### (RETALIATION)
### 42 U.S.C. § 1983

60.    Under 42 U.S.C. § 1983, state actors are liable at law or equity for their acts or omissions undertaken under color of law which deprive any person of the rights secured by the Constitution and laws of the United States.

61.    Defendants are state actors and, at all times relevant to this Complaint, were

acting and are acting under color of law.

62.     Plaintiff's communication with persons outside Huron Valley for the purpose of reporting the abuse, neglect and/or mistreatment of mentally ill inmates she witnessed was constitutionally protected speech.

63.     Defendants terminated plaintiff from her position as a POA, and have otherwise taken adverse action against her regarding her eligibility for employment and other privileges, because of her protected speech.

64.     In so doing, defendants have violated plaintiff's rights under the First Amendment to the United States Constitution, as applicable to the States through the Fourteenth Amendment and enforceable through 42 U.S.C. § 1983.

## COUNT TWO
## VIOLATION OF THE MICHIGAN WHISTLEBLOWERS' PROTECTION ACT
## M.C.L. §§ 15.361-15.369

65.     Section 2 of the Michigan Whistleblowers' Protection Act, M.C.L. § 15.362, provides as follows:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

66.     Plaintiff was employed by defendants as a POA.

67.     During her employment as a POA, plaintiff witnessed abuse, neglect and/or mistreatment of mentally ill inmates that she knew or reasonably suspected constituted a violation of the laws, regulations, or rules of this State or the United States, including but not

11

limited to the Eighth Amendment to the United States Constitution, the Americans with

Disabilities Act, the analogous provisions of the Michigan Constitution and Michigan state law,

and regulations of the Michigan Department of Corrections.

68.     Defendants terminated plaintiff from her position as a POA, and have otherwise

discriminated against her regarding compensation, terms, conditions, location and privileges of

employment, because plaintiff and persons acting on her behalf reported the above-described

abuses and violations to state and federal officials with responsibility or authority to investigate

them.

69.     In so doing, defendants have violated plaintiff's rights under the Whistleblowers'

Protection Act.

## DEMAND FOR RELIEF

Based on the foregoing allegations and claims, plaintiff requests that this Court:

a.     assert jurisdiction over this matter;

b.     enter judgment in favor of plaintiff and against defendants;

c.     order defendants to reinstate plaintiff as a POA;

d.     declare that the First Amendment and Whistleblowers' Protection Act prohibit defendants from taking adverse action against POAs for reporting incidents in which corrections officers and staff abuse, neglect and/or mistreat mentally ill inmates;

e.     enjoin defendants from taking adverse action against plaintiff for reporting incidents in which corrections officers and staff abuse, neglect and/or mistreat mentally ill inmates;

f.     enjoin defendants from denying plaintiff employment or privileges based on the conduct that led to her termination as a POA;

g.     award plaintiff damages (except that plaintiff does not seek damages from the official-capacity defendant, Warden Stewart);

h.     award plaintiff costs and reasonable attorneys' fees; and

       i.       provide any other relief deemed just and equitable.

### JURY DEMAND

Plaintiff demands a jury on all issues so triable.

Respectfully submitted,

/s/ Daniel S. Korobkin
Daniel S. Korobkin (P72842)
Michael J. Steinberg (P43085)
American Civil Liberties Union Fund
  of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6824
dkorobkin@aclumich.org
msteinberg@aclumich.org

Attorneys for Plaintiff

Dated: November 25, 2015