UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHAREE MILLER,                                          Case No. 15-14164

      Plaintiff                                       Sean F. Cox
v.                                                      United States District Judge

ANTHONY STEWART, *et al.*,                              Stephanie Dawkins Davis
                                                        United States Magistrate Judge
      Defendants.
_____/

## REPORT AND RECOMMENDATION
## MOTION FOR SUMMARY JUDGMENT (Dkt. 75)

## I.    PROCEDURAL HISTORY

Plaintiff, Sharee Miller, filed this lawsuit on November 25, 2015, against Anthony Stewart, Robin Howard, and Renata Patton, all employees of the Michigan Department of Corrections, claiming retaliation under the First Amendment and a claim under Michigan's Whistleblower's Protection Act (WPA).  (Dkt. 1).  On February 18, 2016, District Judge Sean F. Cox referred this matter to the undersigned for all pretrial proceedings.  (Dkt. 7).  After a period of discovery, defendants filed a motion for summary judgment.  (Dkt. 75, 76).  This matter is fully briefed.  (Dkt. 86, 87, 88).  The parties filed their joint statement of resolved and unresolved issues on September 20, 2018.  (Dkt. 91).  The Court held a hearing and received oral arguments from both parties.  (Dkt. 92).  This matter is now ready for report and recommendation.

For the reasons set forth below, the undersigned **RECOMMENDS GRANTING** defendants' motion for summary judgment on plaintiff's WPA claim and **GRANTING** defendants' motion for summary judgment on plaintiff's First Amendment retaliation claim, as to her claims for money damages only.  Further, the undersigned **RECOMMENDS DENYING** defendants' motion to the extent they seek summary judgment on plaintiff's First Amendment retaliation claim against defendants in their official capacities.

## II.    FACTUAL BACKGROUND

### A.    The Complaint

Miller sued three employees of the Huron Valley Correctional Facility (WHV), which is in Ypsilanti, Michigan.  First, she sues Warden Anthony Stewart in his official capacity only.  According to defendants, Stewart did not begin working as Warden at WHV until February 1, 2015, after the allegations in the Complaint arose.  Miller also sues Inspector Robin Howard and Classification employee Renata Patton in their individual capacities.  (Dkt. 1, Pg ID 1, 3).  Miller claims that she was released from the Prisoner Observation Aid (POA) Program at WHV in retaliation for complaining about the mistreatment of the prisoners who she was observing as part of that program.  (Dkt. 1, Pg ID 3, 10).  Miller says the officials violated her rights under the First Amendment of the Constitution (Dkt. 1, Pg ID 10 11) as well as her rights under the WPA, codified in Mich. Comp. Laws

§§ 15.361-15.369.  (Dkt. 1, Pg ID 11, 12).  She seeks both compensatory and injunctive relief against defendants Howard and Patton, but only injunctive relief against Stewart.  (Dkt. 1, Pg ID 12).

      B.    <u>The Prisoner Observation Aide Program</u>

This lawsuit derives from Miller's role in MDOC's POA program. Therefore, a summary of the program is perhaps helpful to begin.  It is MDOC's policy to place prisoners who are suicidal or self-injurious in cells by themselves, under one-on-one, direct and continuous observation.  (Dkt. 86-2, Ex. A, POA Training PowerPoint).  For observation of these at-risk prisoners throughout each day, MDOC relies on a combination of corrections staff and prisoners assigned as POAs who are specially selected, trained, and carefully screened.  *Id*. p. 3.  MDOC began using POAs in approximately 2012, and WHV piloted the POA program for the MDOC in Michigan.  (Dkt. 86-3, Ex. B, R. Patton Dep., 22:3-22:6; 23:13). Defendant Patton was the only Corrections Program Coordinator ("CPC") responsible for the POA program at WHV.  *Id*. at 16:21-23.

POAs' job duties require them to continuously observe the mentally ill prisoner to whom they are assigned on a given day, to log their observations at regular intervals, and to contact a corrections officer or other staff if a mentally ill prisoner is in distress, or if some other emergency arises.  (Dkt. 86-4, Ex. C, Prisoner Observation Rules and Procedures, at 1).  POA rules and procedures

require each POA to maintain appropriate confidentiality of her observations.  *Id*.

at 3.  The confidentiality clause provides, in pertinent part:

> Away from the Job
>
> 1.     Confidentiality is very important in prisoner
> observation.  Relevant information should only be shared
> with staff or the next shift of Prisoner Observers.
> Inappropriate sharing of information about the observed
> prisoner will be grounds for immediate removal from the
> job. Prisoner Observers are only to discuss what the
> assigned prisoner says or does or what is said/done to the
> prisoner with housing staff on the unit or relief observers
> (staff or prisoner).

*Id*.  The confidentiality provision authorizes removal of any POA who shares

information "inappropriate[ly]."  The terms "relevant" and "appropriate" are not

further defined in the policy, and Miller points out that Patton does not specifically

explain the meaning of the confidentiality provision when training POAs.  (Dkt.

86-3, Ex. B, at 117:13-25 and 118:1-3).

Miller began working as a POA at WHV in March 2014.  (Dkt. 86-5, Ex. D,

S. Miller Dep., 23:1-6).  She received job training as a POA before assuming her

responsibilities.  *Id*. at 11:11-13.  And she received wages in exchange for her

services as a POA.  *Id*. at 9:4-6.

B.     Miller's Observations

1.     The Bielby Incident

During a POA shift in spring 2014, Miller witnessed corrections officers

abuse and mistreat a mentally ill inmate, Rochelle Bielby. (Dkt. 86-5, Ex. D, p. 23:14-18). After Bielby became upset and lost her temper, corrections officers stripped Bielby of her clothes and restrained her. (*Id*. at 26:16-18; Dkt. 86-6, Ex. E, Critical Incident Report). According to Miller, WHV officials cuffed Bielby's wrists and ankles and used a chain to hog-tie her wrists and ankles together behind her back with her knees bent while leaving her lying prone. (Dkt. 86-6, Ex. D, at 31:8-14). Miller says Bielby was naked, tied, and alone in her cell. *Id*. at 34: 1-18. Bielby repeatedly cried out that she was in pain, which caused Miller to be concerned for Bielby's well-being. Miller's main reason for concern was that if Bielby had fallen from her bed, she would have no way to catch herself while restrained in the hogtied position. *Id*. at 36:1-5. According to Miller's recollection of the event, officers stated that Bielby had to stay in that position because Bielby had struggled and fought her restraints. *Id*. at 34:19-36:1-5. Miller maintains that Bielby was left naked, hog-tied, and screaming out in pain for four hours and fifty-two minutes. *Id*. at 39:3-25; Dkt. 86-6, Ex. E, at 001491. Miller says she observed Bielby sliding off her bed with her extremities bound. (Dkt. 86-5, Ex. D, at 39:3-25). Although she notified a sergeant about this danger, Miller was told dismissively that Bielby would be fine. *Id*. at 42:5-11.

Miller was disturbed by this treatment of a mentally ill inmate and claims she made several attempts to address the incident with authorities at WHV as a

result. *Id*. at 41:3-23, 42:16-44:13, 68:14-69:10. None of her attempts proved fruitful. For example, at a POA meeting the next day, Miller complained to Patton, who supervised the POA program. *Id*. at 42:16-44:13. Patton indicated that the officer's conduct was appropriate and that Miller was mistaken. *Id*. at 43:22-44:2. Based on this response, Miller sent a kite (or written request) to Howard, but she received no response. *Id*. at 44:3-15.

Because WHV was not taking her claims seriously, Miller felt she exhausted her avenues to report the abuse within WHV, and says she was forced to contact advocates outside WHV for aid. Acting on Miller's behalf, persons and organizations outside WHV (e.g. "Humanity for Prisoners") reported the abuse to public officials and agencies who initiated investigations. Although Howard knew Miller had reported Bielby's alleged mistreatment to others outside of WHV, she met with Miller but did not reprimand her. *Id*. 48:2-15. Instead, Howard simply encouraged Miller to tell the truth. *Id*.

Howard says that after she learned of Miller's correspondence to Humanity for Prisoners about Bielby's treatment, she investigated Miller's report of mistreatment by reviewing video and critical incident reports to determine the veracity of Miller's allegations. (Dkt. 75-4, Ex. 3, Howard dep, p. 48). Howard's investigation led her to determine that Miller's allegations had no credibility. *Id*. at 49. Howard met with Miller on June 4, 2014. Although Howard concluded that

Miller breached her POA confidentiality agreement, she did not recommend

removing Miller from her POA position. Howard says she did remind Miller,

however, that because she signed the confidentiality agreement, she was not to

report information that she learned during her POA assignment to those outside of

the prison. *Id*. at 58-61.

### 2.    The Martin Incident

In mid-June 2014, Miller says she again witnessed disturbing abuse and

mistreatment of a mentally ill and/or disabled inmate. (Dkt. 1, Compl., p. 6). This

time, Miller was acting as a POA for inmate Darlene Martin. *Id*. Martin was not

eating and could not operate the sink in her cell to drink water because of her

weakened condition. (Dkt. 86-5, Ex. D, at 50:16-52:9). To drink water, Martin

tried to splash water out of the toilet in her cell. *Id*. But, claiming that her actions

made a mess, corrections officers turned off all water to Martin's cell. *Id*. at 51:10-

12. Miller informed officers that Martin was begging for water. *Id*. at 52:2-9.

Every few hours a tiny paper cup with a few ounces of water was placed in

Martin's cell, but Miller says Martin remained dehydrated. *Id*. at 53:13-18. Over

the course of several days as a POA for Martin, Miller sent multiple kites to Patton

and Howard about Martin's condition. *Id*. at 56:6-9. Miller reported that

Martin was not eating, was denied water, and appeared to be in distress. Miller's

kites went unanswered. *Id*. at 56:16-18.

According to Miller, Martin's condition grew worse.  Miller saw Martin foaming at the mouth, vomiting, naked, and unresponsive to verbal cues.  *Id*. at 57:15-19.  Equally concerning, Miller perceived the nurse on duty to be indifferent to Martin's overall health condition, only stopping in Martin's cell occasionally to administer a shot.  *Id*. at 56:19-57:1.  The nurse did not take Martin's vital signs, did not attempt to engage Martin in any conversation, and did not appear concerned about Martin's deteriorating condition.  (Dkt. 1, Compl., p 7; Dkt. 86-7, Ex. F, K. McDonnell Deposition, 30:14-15 (Q. Did you take vitals at that time? A. No.").  Troubled by what she thought to be inadequate medical attention for Martin, Miller reported her observations to the nurse.  (Dkt. 1, Compl., p 8).  The nurse simply stated that she knew what she was doing and dismissed Miller's concerns.  *Id*.  Approximately one hour after Miller reported her concerns for Martin to the nurse, Martin went into cardiac arrest and was rushed to the hospital. *Id*.; Dkt. 87-1, Ex. G, Martin's Medical Records from St. Joseph Mercy Hospital, at 001266 (noting Martin "was apparently seen by a prison inmate having some breathing difficulties  and by the time the patient was found in her cell, she was unresponsive in her bed").  Martin was placed on life support and not expected to live.  (Dkt. 87-2, Ex. H, Martin's Discharge Summary Medical Records from St. Joseph Mercy Hospital, at 001327).  Martin ultimately survived, but she is in a vegetative state because of the incident.  *Id*. ("Her mental status did improve but

not to her baseline. She improved enough to eat though she has to be fed. She speaks but she does not follow commands.").  Miller feared other mentally ill women at WHV were at risk of similar abuse and mistreatment.  She says she was, therefore, compelled to contact professional advocates outside of WHV to ask for help.  (Dkt. 86-5, Ex. D, at 71:25-72:5).

C.   Miller's Termination as a POA

Notwithstanding Howard's reminder to Miller not to disclose confidential information that she learned as a POA, Miller made a telephone call to Carol Jacobsen, a prisoner-rights advocate indicating – falsely according to MDOC – that another prisoner, whose condition Miller became aware of in her role as a POA, had died because she was allegedly deprived of food and water.  (Dkt. 75-4, Ex. 3, p. 72).  On June 23, 2014 and June 24, 2014, Miller also sent email messages to an individual named "Doug" at Humanity for Prisoners in which she revealed additional information about the prisoner on POA status, including: the prisoner's identity, why the prisoner was placed in one-on-one observation, the food the prisoner was offered, the prisoner's physical and mental state, that the prisoner was issued medication, and information that other POAs had reported about the prisoner.  (Dkt. 75-5, Ex. 4, Miller's 6/23/14 JPay correspondence; Dkt. 75-6, Ex. 5, Miller's 6/24/14 JPay correspondence).

On July 16, 2014, Patton informed Miller that she was being terminated

from her position as a POA at the directive of Howard.  (Dkt. 1, Compl., p. 9; Dkt.

87-3, Ex. I, Email from Howard, 000428; Dkt. 87-4, Ex. J, Email from Patton,

000430).  Written documentation regarding her termination, signed by Defendant

Patton, states:

> Prisoner Miller 326122 began working as a prisoner
> observation aid on 3/5/2014.  On 7/11/2014,
> classification was notified by Inspector Howard that
> prisoner Miller has engaged in sharing confidential
> information regarding prisoners she had observed with
> persons other than staff or a relieving POA.  According
> to Prisoner Observation Rules and Procedures signed by
> prisoner Miller on 4/8/2014 Section "Away from the
> Job" Paragraph 1 it states that "Confidentiality is very
> important in prisoner observation. Relevant information
> should only be shared with staff of the next shift of
> prisoner Observers. Inappropriate sharing of information
> about the observed prisoner will be grounds for
> immediate removal from the job. Prisoner Observers are
> only to discuss what the assigned prisoner says/does or
> what is said/done to the prisoner with housing staff on
> the unit or relief observes (staff or prisoner)." Based on
> information received from Inspector Howard's office, it
> has been determined that prisoner Miller did not comply
> with the above confidentiality statement, thus she is
> being removed from the POA position effective
> immediately.

(Dkt. 86-12, Ex. K, Miller Termination Notice).

## III. ANALYSIS AND CONCLUSIONS

### A. Standard of Review

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record...; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). Furthermore, the evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for

11

trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). That is, the party

opposing a motion for summary judgment must make an affirmative showing with

proper evidence and must "designate specific facts in affidavits, depositions, or

other factual material showing 'evidence on which the jury could reasonably find

for the plaintiff.'" *Brown v. Scott*, 329 F.Supp.2d 905, 910 (6th Cir. 2004).

To fulfill this burden, the non-moving party need only demonstrate the

minimal standard that a jury could ostensibly find in his favor. *Anderson*, 477 U.S.

at 248; *McLean v. 988011 Ontario*, *Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

However, mere allegations or denials in the non-movant's pleadings will not

satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving

party. *Anderson*, 477 U.S. at 248, 251.

The Court's role is limited to determining whether there is a genuine dispute

about a material fact, that is, if the evidence in the case "is such that a reasonable

jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Such a determination requires that the Court "view the evidence presented through

the prism of the substantive evidentiary burden" applicable to the case. *Id*. at 254.

Thus, if the plaintiff must ultimately prove her case at trial by a preponderance of

the evidence, on a motion for summary judgment the Court must determine

whether a jury could reasonably find that the plaintiff's factual contentions are true

by a preponderance of the evidence. *See id.* at 252-53. Finally, if the nonmoving

12

party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the movant is entitled to summary judgment. *Celotex*, 477 U.S. at 323. The Court must construe Rule 56 with due regard not only for the rights of those "asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury," but also for the rights of those "opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Id*. at 327.

      B.    <u>Whistleblower's Protection Act</u>

Miller contends that her removal from her POA position violated WPA. The WPA provides, in relevant part, that:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, locations, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, …

Mich. Comp. Laws § 15.362. To establish a *prima facie* case under the WPA, a plaintiff must show that (1) the plaintiff was engaged in protected activity as defined by the act, (2) the plaintiff was discharged or discriminated against, and (3)

a causal connection exists between the protected activity and the discharge or adverse employment action.  *Chandler v. Dowell Schlumberger*, *Inc.*, 456 Mich. 395, 399 (1998).

Defendants argue that Miller's WPA claim fails because (1) she was not engaged in protected conduct; and (2) she is not an employee of the MDOC and thus, does not enjoy WPA protections.  Of course, Miller contends that her conduct of reporting the possible abuse of mentally ill prisoners is protected conduct and maintains that she is an employee using the "economic realities" test applied by the Michigan courts where WPA claims are asserted.  In the view of the undersigned, the Court must first determine whether the Michigan Supreme Court would apply the WPA to prisoners holding jobs while they are incarcerated.

The final decisions of the Michigan Supreme Court govern any disputes regarding Michigan law.  *Conlin v. Mortg. Elec. Registration Sys., Inc*., 714 F.3d 355, 358-59 (6th Cir. 2013) (citing *Savedoff v. Access Grp., Inc*., 524 F.3d 754, 762 (6th Cir. 2008)).  There is no case, however, from the Michigan Supreme Court settling the primary question before this Court.  That is, whether the WPA, which applies to those in an employee-employer relationship as defined in the statute, applies to inmates working for pay while in the custody of the Michigan Department of Corrections.  Importantly, in the absence of binding case law from the Michigan Supreme Court, this Court must predict how the state's highest court

would rule on this issue.  When a case in federal court is based on diversity jurisdiction or supplemental jurisdiction, the law of the state relating to the substantive rights of the parties should be applied as if the case were being litigated in state court.  *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 741 (6th Cir. 1999) (When deciding a state law claim based on supplemental jurisdiction, a federal court is "bound to apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction.").  "[T]he intent of [*Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)] was to ensure that, in all cases where a federal court is exercising jurisdiction solely because of the diversity of citizenship of the parties, the outcome of the litigation in the federal court should be substantially the same ... as it would be if tried in a State court."  Whenever the "source of substantive rights enforced by a federal court under diversity jurisdiction ... is the law of the States [as] authoritatively declared by a State, whether its voice be the legislature or its highest court, such law ought to govern in litigation founded on that law, whether the forum of application is a State or a federal court."  *Guaranty Trust Co. of New York v. York*, 326 U.S. 99, 109, 112 (1945).  To the extent rulings by the Michigan Supreme Court do not directly resolve a dispute, "[this Court] must make an *Erie* guess to determine how that court, if presented with the issue, would resolve it."  *Id*. (citing *Savedoff*, 524 F.3d at 762).  In guessing how the Michigan Supreme Court might resolve an issue, "'[i]ntermediate state

appellate courts' decisions are also viewed as persuasive unless it is shown that the state's highest court would decide the issue differently.'" *Id*. at 359 (alteration in original) (quoting *Savedoff*, 524 F.3d at 762).

One case from the Michigan Court of Appeals is instructive to the inquiry before the Court.  In *Manville v. Board of Governors of Wayne State University*, 85 Mich. App. 628, 630-631 (1978), the court examined a claim for application of Michigan's minimum wage law to the wages of a prisoner who worked for Wayne State University (WSU) as a clerk for WSU's educational program at Jackson Prison while he was incarcerated as an inmate.  The *Manville* court first observed that it was "undisputed that an inmate is not entitled to the minimum wage if employed by the prison."  *Id*. at 631.  This was so because "inmates have no right to the fruit of their labor when working for a prison, because the labor of inmates belongs to the state."  *Id*. at 632 (citing *Sims v. Parke Davis & Co*., 334 F.Supp. 774, 791 (E.D. Mich. 1971), aff'd 453 F.2d 1259 (6th Cir. 1972); *Huntley v. Gunn Furniture Co.*, 79 F.Supp. 110, 113 (W.D. Mich. 1948)).  Even though the court found that plaintiff had sufficiently pleaded his status as an employee pursuant to the economic realities test, and after observing that prisoners were not specifically excluded from the Michigan Minimum Wage law, the court went on to conclude that the plaintiff was not an employee because such a finding would conflict with the more specific and later-enacted Correctional Industries Act (CIA), which

governed the inmate's pay rate, Mich. Comp. Laws. § 800.321, *et seq.*  *Id*. at 634-

636.  The court of appeals further concluded:

> We believe this result to more accurately reflect the
> reality of prison employment. The regulation of inmate
> employment is a matter over which prison authorities
> retain constant control.  Because of the unique situation
> of prison employment, it is likely that inmate employees
> were never intended to be given the protection afforded
> the general population under the Minimum Wage Law.
> *Sims*, *supra*, stopped short of holding this, but it did
> indicate that this proposition was probably correct.
> Moreover, with respect to the Federal minimum wage
> law, the Federal wage and hour administrator has adopted
> this approach.

*Id*. at 636-637 (internal footnotes omitted).  And, the court further noted that

because plaintiff was not employed by a private industry, the application of the

economic reality test would serve no purpose.  *Id.* at 637.  Rather, the plaintiff's

employment related to the operation of a university behind prison walls for the

benefit of the prison and a prison rehabilitation program, the fruits of which

belonged to the state, not the inmate.  *Id*.

With the principles set forth in *Manville* in mind, it seems likely that the

Michigan Supreme Court would follow the great weight of case law from around

the country concluding that statutes applying to the employee-employer

relationship simply do not apply to inmates working while incarcerated.  For

example, the majority of cases faced with the issue have concluded that Title VII,

the federal employment discrimination statute, does not apply to inmates who are

assigned prison jobs.  *Smith v. Gonzales*, 2018 WL 1088003 (N.D. Tex. Feb. 2,

2018) (citing *West v. Goord*, 2017 WL 3251253, at *16 (W.D.N.Y. July 31,

2017)[1]); *see also Pope v. United States*, 2017 WL 6523141 (C.D. Ill. Aug. 28,

2017) ("[T]he majority of the federal courts that have considered the issue have

held 'that Title VII, an employment discrimination statute, does not apply to

inmates who are assigned to prison jobs.'" (citation omitted).  Likewise, Courts

have concluded that Title I of the Americans with Disabilities Act (ADA), which

prohibits disability discrimination in employment, does not apply to a prisoner who

is obligated to work at a job pursuant to a prison work program under state law

because the prisoner does not have "an employment relationship" for purposes of

the ADA.  *Addison v. California Institution for Men*, 2016 WL 8732476, *7 (C.D.

Cal. Nov. 1, 2016) (citing *Castle v. Eurofresh, Inc.*, 731 F.3d 901, 906-908 (9th

Cir. 2013) (holding that an Arizona inmate was not an employee of a prison

contractor under the ADA because "his labor belongs to the State of Arizona,

---

[1] *See Williams v. Meese*, 926 F.2d 994, 997 (10th Cir. 1991) (inmate was not "employee" under Title VII because his relationship with defendants arose from his status as inmate, not as employee); *Wilkerson v. Samuels*, 524 Fed. Appx. 776, 779 (3d Cir. 2013) (protections afforded under Title VII did not apply to prisoners' job in prison factory); *Iheme v. Smith*, 529 Fed. Appx. 808, 809 (8th Cir. 2013) (inmate worker should not be treated as an "employee" for purposes of Title VII); *Stile v. Fed. Bureau of Prisons*, 2016 WL 8710396, at *6 (D. N.J. Aug. 26, 2016) (same); *McCaslin v. Cornhusker State Indus.*, 952 F.Supp. 652, 657 (D. Neb. 1995) (concluding that Title VII does not apply to prisoners working in a prison setting); *Smith v. Sumner*, (E.D. Mo. 2011), 2011 WL 4342617 at *6 ("Title VII does not apply to the prisoner working in the state prison, for the state prison industry as part of his or her sentence"); *Jones v. Lockett*, (W.D. Pa. 2009), 2009 WL 2232812 at *5 (citing several federal cases supporting the conclusion that prison inmates are not employees for purposes of Title VII).

which put him to work" in order to comply with a state statute requiring all able-bodied prisoners to work.)).   Courts have also concluded that prisoners are not "employees" under the Fair Labor Standards Act, *see Hale v. Arizona*, 993 F.2d 1387, 1395 (9th Cir. 1993) (*en banc*) or under the whistleblower protections provisions of the Clean Air and Toxic Substances Control Act, *Coupar v. U.S. Dep't of Labor*, 105 F.3d 1263, 1266 (9th Cir. 1997).  *See also*, *Mrazek v. Herman*, 2016 WL 695975 (C.D. Ill. Feb. 19, 2016) ("Plaintiff also alleges several Defendants violated the Whistleblower Protection Act, but Plaintiff cannot state a claim pursuant to this statute because it applies only to federal employees, not prisoners.").

In both *Hale* and *Coupar*, the Ninth Circuit applied an "economic reality" test to determine if an inmate was an employee for purposes of the federal FLSA or Whistleblower statute.  When an inmate is "working for a prison, in a program structured by the prison pursuant to state law requiring prisoners to work at hard labor," *Hale*, 993 F.2d at 1393, "the economic reality of the relationship between the worker and the entity for which work was performed lies in the relationship between prison and prisoner. It is penological, not pecuniary." *Coupar*, 105 F.3d at 1295 (quoting *Hale*, 993 F.2d at 1395).  "The Ninth Circuit specifically rejected application of the conventional master-servant relationship test urged by the plaintiff to such inmate labor or, put another way, reasoned that such inmates and

the statutorily created entities that set up their work programs are not in a

conventional master-servant relationship." *Castle v. Eurofresh, Inc.*, 2010 WL

797138 (D. Ariz. Mar. 8, 2010) (citing *Coupar*, 105 F.3d at 1267).

Similarly, the jobs provided to inmates in the custody of the Michigan

Department of Corrections are primarily penalogical in nature, as explained in

Mich. Comp. Laws § 800.331:

> (1) It is the intent of this act [the Correctional Industries
> Act] to do all of the following:
>
> (a) Provide adequate, regular, diversified, and suitable
> employment for inmates of the state for the purpose of
> enhancing job skills consistent with proper penal
> purposes.
>
> (b) Utilize the labor of inmates for self-maintenance and
> for reimbursing the state for expenses incurred by reason
> of their crimes and imprisonment, and for employment in
> private manufacturing or service enterprises established
> under section 7a.1
>
> (c) Provide a means for inmates to earn wages for
> support of their families, reimbursement to the state for
> part of the cost of their imprisonment, restitution to crime
> victims, and other purposes consistent with their
> imprisonment.
>
> (d) Effect the requisitioning and disbursement of
> correctional industries products and services directly
> through established state authorities without possibility
> of private profits and without any intermediating
> financial considerations, appropriations, or expenditures.

> (e) Permit the management of correctional industries to
> operate in a manner as similar as possible to similar
> private industrial operations.

(Emphasis added).  Though subpart "c" mentions providing a means to earn wages

to support inmates' families as one of the reasons for the Act, the overarching

purposes set forth are to serve penological interests.  Indeed, reading items (a)-(e)

above in aggregate does not suggests that the Legislature intended to create a

traditional employee-employee relationship by providing jobs to prison inmates

while they are incarcerated.  Thus, the "economic reality" of Miller's job does not

suggest a traditional employee-employer relationship.  Rather, the fact that she had

a job as a POA is based on the MDOC's penalogical system and her work has a

penalogical purpose.  *See e.g.*, *Danneskjold v. Hausrath*, 82 F.3d 37, 42 (2d Cir.

1996) ("The relationship" between prison and prisoner, the Court reasoned, "is not

one of employment; prisoners are taken out of the national economy; prison work

is often designed to train and rehabilitate; prisoners' living standards are

determined by what the prison provides; and most such labor does not compete

with private employers."); *see also Harker v. State Use Indus*., 990 F.2d 131, 133

(4th Cir. 1993) ("Inmates perform work for [the prison] not to turn profits for their

supposed employer, but rather as a means of rehabilitation and job training.").

Thus, Miller was not an "employee" for purposes of the WPA and her claim based

on that statute must fail.

C.   <u>First Amendment Retaliation</u>

The Supreme Court has recognized that prison inmates retain those First Amendment rights not incompatible with their status as prisoners.  *Pell v. Procunier*, 417 U.S. 817, 832 (1974); *see also Jones v. Caruso*, 569 F.3d 258, 267 (6th Cir. 2009) (construing prior, broader version of Mich. Dep't of Corr., Policy Directive 05.03.118 ¶ HH(23) as unconstitutionally vague).  Retaliation based on a prisoner's exercise of constitutional rights violates the Constitution.  *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).  To establish a First Amendment retaliation claim, the plaintiff must prove that: (1) the plaintiff engaged in activities protected by the Constitution or statute; (2) the defendant took an adverse action that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was taken at least in part because of the exercise of the protected conduct.  *Id.*  It is well-established that prison officials cannot take adverse actions against inmates for the exercise of their First Amendment rights.  As the Sixth Circuit has observed, "[p]risons have an interest in keeping the inmates as safe and secure as possible while imprisoned, and truthful speech that describes possible abuses can actually be quite consistent with that objective."  *Griffin v. Berghuis*, 563 Fed. Appx. 411, 416 (6th Cir. 2014) (quoting *Bridges v. Gilbert*, 557 F.3d 541, 551 (7th Cir. 2009)).  "[P]rotected speech" is speech regarding matters of public interest or concern.  *Lockett v.*

*Suardini*, 2006 WL 2521621, at *8 (W.D. Mich. Aug. 30, 2006), aff'd, 526 F.3d 866 (6th Cir. 2008) (citing *Rankin v. McPherson*, 483 U.S. 378 (1987); *Connick v. Myers*, 461 U.S. 138 (1983)).[2]  A prisoner's First Amendment rights "may be curtailed whenever the institution's officials, in the exercise of their informed discretion, reasonably conclude that [the exercise of those rights] possess[es] the likelihood of disruption to prison order or stability, or otherwise interfere[s] with the legitimate penological objectives of the prison environment."  *Griffin*, 563 Fed. Appx. At 416-417 (quoting *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 132 (1977)).

"[I]f a prisoner violates a legitimate prison regulation, he is not engaged in 'protected conduct,' and cannot proceed beyond step one."  *Thaddeus-X*, at 395.  "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  *Turner v. Safley*, 482 U.S. 78, 89 (1987).  The Supreme Court has identified four factors relevant to determining the reasonableness of a challenged prison regulation:

---

[2]  The Sixth Circuit has not yet resolved the question of whether prisoner speech must address a matter of public concern to be considered protected speech.  Most courts addressing this issue have found that it is unlikely that the Sixth Circuit would afford *more* protection to prisoner speech than public employee speech and thus, they conclude that protected prisoner speech must have a foundation in a matter of public concern.  *Spearman v. Stoddard*, 2011 WL 4005381, at *7 n. 9 (W.D. Mich. Mar. 30, 2011), report and recommendation adopted, 2011 WL 4005376 (W.D. Mich. Sept. 8, 2011).  Thus, at a minimum, it is well-established that prisoner's speech on matters of public concern are protected, subject to the *Turner* inquiry.

> 1.      there must be a valid, rational connection between
> the prison regulation and the legitimate governmental
> interest put forward to justify it;
>
> 2.      there must be alternative means of exercising the
> right that remain open to prison inmates;
>
> 3.      we must consider the impact that accommodation
> of the asserted constitutional right will have on guards
> and other inmates and on the allocation of prison
> resources generally; and
>
> 4.      there must not be alternatives available that fully
> accommodate the prisoner's rights at de minimis cost to
> valid penological interests.

*Turner*, 482 U.S. at 89-91; *Jones*, 569 F.3d at 266-67.  Failure to satisfy the first

factor renders the regulation unconstitutional without regard to the remaining three

factors.  *Id.* at 267.  If the first factor is satisfied, the remaining factors are

considered and balanced together as "guidelines" by which the court can assess

whether the challenged actions are reasonably related to a legitimate penological

interest.  *Id.*  It should further be noted that the *Turner* standard is "not a 'least

restrictive alternative' test" requiring prison officials "to set up and then shoot

down every conceivable alternative method of accommodating the claimant's

constitutional complaint."  *Flagner v. Wilkinson*, 241 F.3d 475, 484 (6th Cir. 2001)

(quoting *Turner*, 482 U.S. at 90-91).  Instead, the issue is whether the policy or

action at issue is reasonably related to a legitimate penological interest.  *Id.*

There is some suggestion that the *Turner* standard applies only to incoming correspondence to a prisoner or correspondence between prisoners; whereas the stricter standard set forth in *Procunier v. Martinez*, 416 U.S. 396 (1974), applies to correspondence outgoing from the prisoner. *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989) ("…[T]he logic of our analyses in *Martinez* and *Turner* requires that *Martinez* be limited to regulations concerning outgoing correspondence. As we have observed, outgoing correspondence was the central focus of our opinion in *Martinez*. The implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials."). In *Martinez*, the Court held that any regulation or practice that restricts inmate correspondence must be generally necessary to protect the governmental interests of security, order, and rehabilitation. *Martinez*, 416 U.S. at 413-414. But the question seems somewhat academic here as the subject regulation does not satisfy even the more forgiving *Turner* standard; thus, by default it could not pass muster under *Martinez*.

Defendants' primary argument[3] in support of summary judgment on Miller's First Amendment retaliation claim is that she did not engage in protected conduct because her otherwise constitutionally protected speech violated a legitimate prison

---

[3] Defendants do not dispute that Miller suffered an adverse action (the loss of her prison job) and their causation argument is based solely on their contention that she did not engage in protected conduct.

regulation (the confidentially provision in the POA rules).  Defendants argue that because Miller violated a legitimate prison regulation by disclosing confidential information learned from her POA assignment, her conduct was not protected by the First Amendment and, accordingly, she cannot establish the first element of a First Amendment retaliation claim.  Hence, defendants foundationally argue that the POA confidentiality agreement is a "legitimate prison regulation" in that it does not prevent a prisoner from complaining about the alleged mistreatment of other prisoners.  Defendants insist that the POA confidentiality agreement does not preclude a prisoner from filing complaints or complaining to outside agencies about alleged prisoner mistreatment.  Rather, they contend that it only bars a POA from disclosing "confidential information."  That is, Miller was not prohibited from complaining that she believed prisoners were being mistreated at WHV, and she was not precluded from complaining about perceived mistreatment of prisoners based on her own observations or what she learned outside of her role as a POA.  Further, defendants maintain that the POA confidentiality agreement is intended to keep protected health information confidential, as well as to keep confidences that are shared by the observed prisoner or learned by the POA that could impact the safety and security of the observed prisoner and/or WHV.[4]

---

[4]  Defendants also mention that plaintiff's conduct might have arguably violated the Health Insurance Portability and Accountability Act of 1996 (HIPAA), but they have not made a

In response, Miller argues that she can satisfy the *Turner* criteria.[5]
According to Miller, there is no valid, rational connection between WHV's interest
in protecting an inmate's privacy and preventing POAs from disclosing abuse and
neglect of those inmates.  Miller maintains that the confidentiality language is not
only broad and unclear, but as applied to Miller here, it is an exaggerated response
to any real prison concern, and defendants' position rests on speculative concerns,
at best.  *See Whitney*, 677 F.3d at 298.  Further, the confidentiality policy as
written leaves POAs with no alternative avenue available for reporting inmate
abuse and neglect when it is not addressed by WHV officials.  Miller insists that
WHV officials did not address her internal reporting in any meaningful fashion and
accordingly, she had no choice but to report the abuse to outside authorities.  Next,
Miller argues that allowing POAs to report abuse and neglect to outside authorities,
especially when attempts at internal reporting are ignored, would not have
significant ramifications on the liberty of others or on the use of the WHV's
resources for preserving order.  Miller says that WHV could easily screen out
meritless complaints and investigate only those matters deemed to have merit, at

---

case that HIPAA applies here.  Moreover, as Miller points out, HIPAA was not a concern
identified by defendants when they fired her for violating the POA confidentiality provision.

[5]  Miller also argues that because she is a prison employee, the *Pickering* analysis is
applicable.  *See Pickering v. Board of Education*, 391 U.S. 563 (1968).  As set forth *infra*, the
undersigned concludes that Miller's job as a POA does not implicate the traditional employee-
employer relationship.  Thus, the *Pickering* analysis, which applies to public employees, is
inapplicable.

minimal cost. Lastly, Miller argues that the existence of an obvious alternative is evidence that the current speech regulation, as applied to Miller, is an exaggerated response to any legitimate prison concerns. She posits that WHV could devise procedures for reporting abuse to outside authorities when internal reporting is unsatisfactory. At the same time the prison could still bar POAs from improperly disclosing confidential information, "for instance in situations that do not involve abuse or do not involve initial attempts to address problems internally." (Dkt. 86, p. 19).

Defendants have plausibly articulated a valid, rational connection between the confidentiality provision and the government's legitimate interest in protecting prisoners' health care information (whether under HIPAA or otherwise). Further, it is not difficult to see how maintaining the confidentiality of inmate medical information is also rationally related to the good order and security of a prison. MDOC undoubtedly concerns itself with issues that might agitate or cause disruptive or disorderly conduct by its prisoners. And the potential for such agitation or disruption seems apparent in the event of the indiscriminate dissemination of another prisoner's personal medical or other private information. Despite the legitimate governmental interests served by the confidentiality policy, the vagueness of its language, in particular as applied to Miller, diminishes the link between the policy and the interests to be protected. The breakdown is illustrated

by how Patton describes the information protected by the policy and what defendants' counsel argues here. *See e.g.*, Dkt. 86-3, Ex. B, at 117:3-117:9 (Patton explains that "inappropriate sharing of information about the observed prisoner" means "[t]alking about the prisoner's appearance or maybe referring to the way . . . they don't bathe, maybe the way they smell, or maybe like if they are talking to someone that's not there ...").  Further, as discussed in detail below, the undersigned is not convinced that the policy, as written, passes muster under the remainder of the *Turner* inquiry.

Under the second *Turner* factor (i.e. there must be alternative means of exercising the right that remain open to prison inmates), defendants argue that the confidentiality provision does not prevent prisoners from sharing allegations of abuse outside the prison.  Yet, they have not explained how a prisoner can accomplish this task without bearing the risk of losing the POA position.  Indeed, defendants seem to be taking the position that it was somehow permissible for Miller to report abuse to others outside of the prison, but impermissible for her to use any information she learned as a POA, which is, of course, how she learned of the abuse.  Defendants do not provide any examples of how such a feat could be accomplished; nor do they attempt to reconcile the incompatibility of these two propositions.  It would seem that, at best, a prisoner is solely left with the option to make a generic statement that there is abuse, without describing the nature of the

29

abuse or even the circumstances surrounding it – facts that are capable of communication without reference to information traditionally understood to be confidential.  Communicating in the manner described is largely meaningless and would seem to undermine the prison's own interest, as recognized by Sixth Circuit in *Griffin*, 563 Fed. Appx. at 411, 416, in keeping inmates as safe and secure as possible while imprisoned – to the extent that truthful speech describing possible abuses can help.

The facts of this case illustrate the failure to provide a meaningful alternative either in the language of the regulation itself, in the POA training, or in how defendants dealt with Miller's actions in this case.  The confidentiality provision bars a POA from revealing confidential information "inappropriately" and indicates that information received during the job assignment must be kept "strictly confidential."  However, nothing in this regulation itself illuminates what constitutes inappropriate sharing of confidential information.  As Miller points out, the confidentiality rule does not discuss what "inappropriate" sharing of information means, nor does it draw any distinction between "protected health information" and information that may be publicly disclosed.  Further, Patton did not advise POAs about the meaning of "inappropriate" sharing during the POA training she provided.  (Dkt. 86-3, Ex. B, at 117:24-118:3 ("I don't really go through it, this point specifically.").  And, when pressed to explain what

"inappropriate sharing of information about the observed prisoner" means, Patton

testified that it refers to "[t]alking about the prisoner's appearance or maybe

referring to the way . . . they don't bathe, maybe the way they smell, or maybe like

if they are talking to someone that's not there ..." *Id*. at 117:3-117:9.  Patton, who

was charged with training POAs, does not elucidate the meaning of these

provisions in such a way that would provide a reasonable opportunity for a person

of ordinary intelligence to understand what conduct is prohibited and what conduct

is permissible.  And, Miller was not terminated after the first time she shared

"confidential" information, but neither was she provided any more specific

instruction about the term.  Indeed, she received no explanation as to how she

could report prisoner abuse outside the prisoner without running afoul of the POA

policy.  In providing no clarity on this issue, defendants' position that a POA could

report abuse outside the prison but could not use any information learned as a POA

is untenable and fails to provide a meaningful alternative.

 The third and fourth *Turner* factors (the impact that accommodation of the

asserted constitutional right will have on guards and other inmates, and on the

allocation of prison resources generally and the lack of alternatives available that

fully accommodate the prisoner's rights at *de minimis* cost to valid penological

interests), also weigh in favor of Miller.  While defendants have suggested that

allowing inmates to report information outside of the prison may affect the privacy

rights of the inmates who are the subjects of any such reports, they have not averred that there are no alternatives available that fully accommodate the prisoner's rights at a minimal cost to their valid penological interests. Since the meaning of the terms "confidential" and "inappropriate" remain undefined in the policy, the breadth of the impact of disclosure is difficult to discern. Moreover, defendants do not even address the possibility of a reporting mechanism that allows prisoners to report observed abuse without compromising the privacy rights of the abused inmate. For instance, it would seem that a policy allowing progressive reporting, first inside the prison, then to outside authorities if no action is taken or abuses remain unabated but disallowing the outside disclosure of other inmates' personally identifiable and medical information might fully accommodate both the prisoner's rights and the prison's articulated interest. Though defendants are not required to set up then knock down every conceivable alternative, *Turner* does require consideration of the existence of alternatives and defendants offer no analysis in this regard. Taken as a whole, defendants have not demonstrated on this record that the *Turner* factors weigh in their favor.

As noted earlier, the Supreme Court in *Thornburgh* stated that outgoing communications from prisoners are subject to the *Martinez* standard. *Martinez* emphasized that the "limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental

interest involved." 416 U.S. at 413. In view of the above discussion concerning

alternatives, defendants do not meet this less deferential standard either. Thus,

under either standard, defendants have not shown that they are entitled to summary

judgment on plaintiff's First Amendment retaliation claim based on their claim that

Miller did not engage in protected conduct.[6]

D.   Qualified Immunity

"[G]overnment officials performing discretionary functions, generally are

shielded from liability for civil damages insofar as their conduct does not violate

clearly established statutory or constitutional rights of which a reasonable person

would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Sixth

Circuit has articulated a three-part inquiry for evaluating a defendant's entitlement

to qualified immunity, which asks (1) whether the facts taken in the light most

favorable to plaintiff could establish a constitutional violation; (2) whether the

right was a "clearly established" right of which any reasonable officer would have

known; and (3) whether the official's actions were objectively unreasonable in

light of that clearly established right. *Williams v. Mehra*, 186 F.3d 685, 691 (6th

Cir.1999) (*en banc*). The right must be defined at the appropriate level of

specificity to determine whether it was clearly established at the time the

---

[6] Defendants limited the basis of their challenge to an alleged lack of protected conduct on Miller's part. Thus, to the extent that other factors may apply to a claim for First Amendment retaliation, they are unaddressed by the parties and consequently not considered in this Report.

defendants acted. *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). This means that to be "clearly established" the contours of the right must be sufficiently clear so that a reasonable official would understand that what he is doing violates that right. *Id.* "'This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.'" *Wilson*, 526 U.S. at 615 (quoting *Anderson*, 483 U.S. at 640). As set forth above, the undersigned has concluded that, viewing the facts in the light most favorable to plaintiff, defendants have failed to set forth evidence demonstrating that the regulation at issue satisfies the constitutional standard under *Turner* and therefore Miller's conduct was protected.

Generally, there are two ways in which a plaintiff may show that "officers were on notice that they were violating a 'clearly established' constitutional right." *Lowden v. County of Clare*, 709 F.Supp.2d 540, 549 (E.D. Mich. 2010) (quoting *Lyons v. City of Xenia*, 417 F.3d 565, 579 (6th Cir. 2005)). First, "where the violation was sufficiently 'obvious' under the general standards of constitutional care ... the plaintiff need not show 'a body' of 'materially similar' case law." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). Second, the violation may be shown "by the failure to adhere to a 'particularized' body of precedent that 'squarely govern[s] the case....'" *Id.* (quoting *Brosseau*, 543 U.S. at 201). Miller

does not argue that the violation was "obvious."[7]  Thus, the question before the

court is whether a reasonable officer would have understood that Miller was

engaged in protected conduct capable of forming the basis for a First Amendment

retaliation claim in the event of her termination as a POA for violating the policy.

Miller must provide the court with a particularized body of precedent that squarely

governs this case from this Court, the Sixth Circuit Court of Appeals, or the United

States Supreme Court:

> Our review of the Supreme Court's decisions and of our
> own precedent leads us to conclude that, in the ordinary
> instance, to find a clearly established constitutional right,
> a district court must find binding precedent by the
> Supreme Court, its court of appeals or itself.  In an
> extraordinary case, it may be possible for the decisions of
> other courts to clearly establish a principle of law.  For
> the decisions of other courts to provide such "clearly
> established law," these decisions must both point
> unmistakably to the unconstitutionality of the conduct
> complained of and be so clearly foreshadowed by
> applicable direct authority as to leave no doubt in the
> mind of a reasonable officer that his conduct, if
> challenged on constitutional grounds, would be found
> wanting.  Here a mere handful of decisions of other
> circuit and district courts, which are admittedly novel,
> cannot form the basis for a clearly established
> constitutional right in this circuit.

*Ohio Civil Serv. Employees Ass'n v. Seiter*, 858 F.2d 1171, 1177-78 (6th Cir. 1988)

(emphasis added).

---

[7]  Miller concedes that the POA confidentiality rule is "arguably valid on its face."  (Dkt. 86, p. 12).

Defendants argue that removing Miller from her POA assignment because she revealed confidential information in violation of the confidentiality agreement she signed did not violate any clearly established law.  Miller argues that it is well-established in this Circuit that termination from prison employment for engaging in conduct protected by the First Amendment is a constitutional violation, citing *Walker v. Brewer*, 2014 WL 1117835, at *2 (W.D. Mich. Mar. 20, 2014) (concluding that firing from prison job was an adverse action); *Brown v. Johnson*, 2012 WL 32711(S.D. Ohio Jan. 6, 2012) (concluding that the law is clearly established that "taking away an inmate's job assignment in retaliation for the exercise of constitutional rights [is] itself a constitutional violation."); *McGough v. Corrections Corp. of Am.*, 2007 WL 3088213 (M.D. Tenn. Oct. 19, 2007); *Pasley v. Conerly*, 345 Fed. Appx. 981, 985 (6th Cir.2009) (concluding that a threat to have the plaintiff "moved out of the unit so that he would lose his job" was "capable of deterring a person of ordinary firmness from exercising protected rights, the standard for adverse action." (internal quotations omitted).  Miller also points to case law from other circuits holding that prisoners have a right to complain about staff misconduct and cannot be retaliated against for exercising this right.  She contends that this case law provides "a wide variety of sources, even those that are not authoritative, can provide defendants with fair warning" of the unconstitutional nature of their actions, and it is not necessary that the "'very

action in question has previously been held unlawful'" in order for the defendants

to be on notice as to its unlawfulness.  *Barker v. Goodrich*, 649 F.3d 428, 435 (6th

Cir. 2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

The undersigned is not persuaded that a handful of unpublished district court

cases from California and the Ninth Circuit[8] establishes the "wide variety of

sources" exception to the requirement that a plaintiff must offer authority from this

court, the Sixth Circuit, or the Supreme Court to avoid the application of qualified

immunity.  *See Seiter*, *supra* ("For the decisions of other courts to provide such

'clearly established law,' these decisions must both point unmistakably to the

unconstitutionality of the conduct complained of and be so clearly foreshadowed

by applicable direct authority as to leave no doubt in the mind of a reasonable

officer that his conduct, if challenged on constitutional grounds, would be found

wanting.").  Moreover, these cases are readily distinguishable because they did not

involve alleged violations of a confidentiality policy purporting to protect the

privacy and health information of other prisoners.

---

[8] *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009) ("a corrections officer may not retaliate against a prisoner for exercising his First Amendment right to report staff misconduct."); *Martinez v. Madden*, 2013 WL 5232271, at *7 (S.D. Cal. Sept. 16, 2013) (stating the plaintiff provided sufficient evidence to show the defendants retaliated against him for reporting staff misconduct); *Lancaster v. Carey*, 2011 WL 2198313, at *13 (E.D. Cal. June 6, 2011), report and recommendation adopted, 2011 WL 2960908 (E.D. Cal. July 19, 2011), aff'd, 482 Fed. Appx. 301 (9th Cir. 2012) (holding the defendants were not entitled to qualified immunity for their retaliation against the plaintiff-prisoner who reported staff misconduct); *Shepard v. Quillen*, 840 F.3d 686, 688 (9th Cir. 2016) (Allowing prisoners to complain about prison staff "provides a crucial check against those who are in a position to abuse them.").

The undersigned agrees with Miller that it is well-established in this Circuit that prison officials generally cannot terminate a prisoner from a prison job based on the exercise of the prisoner's First Amendment rights.  *See e.g.*, *Good v. Walworth*, 2018 WL 151872 (E.D. Mich. Mar. 27, 2018) (Applying *Seiter* and concluding that decisions within this circuit and other circuits clearly establish that termination from prison employment in retaliation for protected conduct can constitute adverse action.).  Here, however, the appropriate inquiry for purposes of qualified immunity is narrower.  The pertinent question before the Court is whether a reasonable prison official would understand that terminating a prisoner from a prison job for violating a confidentiality policy that is, as plaintiff admits, not unconstitutional on its face, is clearly established.  There are no cases of appropriate precedential value addressing the rights of a prisoner working as a POA (or in any other capacity) to report alleged abuses outside of the prison. There are also no cases of which the undersigned is aware challenging the constitutionality of the confidentiality provision in the Prisoner Observation Rules and Procedures.  Thus, a reasonable prison official would not have known that terminating Miller for violating its confidentiality provision was unconstitutional. Under the Supreme Court's doctrine of qualified immunity, government officers may not be held personally liable "as long as their actions could reasonably have

been thought consistent with the rights they are alleged to have violated."
*Anderson v. Creighton*, 483 U.S. 635, 638 (1987).

Here, prison officials relied on a published policy that they believed allowed them to terminate Miller's employment because she breached its confidentiality provision. While that interpretation was in error, the Sixth Circuit holds that immunity will apply where "a reasonable official could have thought that relying on [a] facially valid regulation … did not violate the prisoners' constitutional rights." *Wolfel v. Morris*, 972 F.2d 712, 719 (6th Cir. 1992). Indeed, qualified immunity is available to "a prison official who relies on a facially valid regulation unless he knows or should know that the regulation violates a well-established constitutional right consisting of the particular act for which he inflicts punishment." *Id*. at 719-720 (quoting *Jihaad v. O'Brien*, 645 F.2d 556, 562 (6th Cir. 1981)). And, if a regulation is *subsequently* found to be unconstitutionally vague, if prison officials reasonably relied on and applied a valid regulation, they are not stripped of the protections of qualified immunity. *Id*. at 720. Miller cannot show that her constitutional "rights were so clearly established when the acts were committed that any officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct." *Dominique v. Telb*, 831 F.2d 673, 676 (6th Cir. 1987). Because it was not well-established at the time Miller's employment was

terminated that the POA confidentiality provision was invalid, defendants are entitled to qualify immunity as to Miller's First Amendment retaliation claim.

    E.    <u>Injunctive Relief</u>

The parties disagree on whether Miller is entitled to injunctive relief. Here, the undersigned has recommended that defendants are entitled to qualified immunity on her First Amendment retaliation claim, which only relieves them of liability for money damages. "The defense of qualified immunity protects officials from individual liability for money damages but not from declaratory or injunctive relief." *Flagner v. Wilkinson*, 241 F.3d 475, 483 (6th Cir. 2001). In the view of the undersigned, until Miller's claims are ultimately resolved on the merits by the district court, a decision regarding the relief available to her is premature. *See e.g.*, *01 Communique Lab., Inc. v. Citrix Sys., Inc.*, 151 F.Supp.3d 778, 809 (N.D. Ohio 2015) ("It is premature to address the availability of injunctive relief until fact evidence is introduced at trial and a determination is made regarding Communique's claims of infringement."); *Bowen v. Kadish*, 2017 WL 7051058, at *7 (M.D. Tenn. Dec. 6, 2017) (A decision on remedies would be premature before plaintiff has prevailed on any of his claims, because plaintiff's remedies would be a moot issue if he does not prevail.).

## IV.   RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS GRANTING** defendants' motion for summary judgment on plaintiff's WPA claim and **GRANTING** defendants' motion for summary judgment on plaintiff's First Amendment retaliation claim, as to her claims for money damages only.  Further, the undersigned **RECOMMENDS DENYING** defendants' motion to the extent they seek summary judgment on plaintiff's First Amendment retaliation claim against defendants in their official capacities.

The parties to this action may object to and seek review of this Report and Recommendation but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and

Recommendation to which it pertains.  Not later than 14 days after service of an

objection, the opposing party may file a concise response proportionate to the

objections in length and complexity.  Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d).

The response must specifically address each issue raised in the objections, in the

same order, and labeled as "Response to Objection No. 1," "Response to Objection

No. 2," etc.  If the Court determines that any objections are without merit, it may

rule without awaiting the response.

Date: March 1, 2019                    s/Stephanie Dawkins Davis
                                       Stephanie Dawkins Davis
                                       United States Magistrate Judge

## CERTIFICATE OF SERVICE

I certify that on <u>March 1, 2019</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to all counsel of record.

                                       s/Tammy Hallwood
                                       Case Manager
                                       (810) 341-7887
                                       tammy_hallwood@mied.uscourts.gov